| | | |
|---|---|---|
| | AUSA: Shankar Ramamurthy | Telephone: (202) 924-5368 |
| AO 106 (Rev. 04/10)  Application for a Search Warrant   Special Agent: | Arnold Kusero | Telephone: (313) 919-1615 |

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>SAMSUNG GALAXY NOTE20 Ultra 5G, IMEI:<br>352712280530902 | )<br>)<br>)<br>)<br>)<br>)  Case No. | Case: 2:22-mc-50219 -4<br>Judge: Drain, Gershwin A.<br> Filed: 02-19-2022 At 05:03 PM<br>IN RE: SEALED MATTER(SW)(MLW) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-4.

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B-4.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343, 18 U.S.C. § 1347 | Health Care Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud and Wire Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Arnold Kusero, Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:  February 19, 2022
_____
*Judge's signature*

City and state:  Detroit, MI

Hon. Anthony P. Patti       U. S. Magistrate Judge
_____
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: <br><br><br> INFINITY VISITING PHYSICIAN SERVICES, PLC. <br> 18000 West Nine Mile Rd, Suite 630, Southfield, Michigan; <br><br> PINNACLE PHYSICIAN MANAGEMENT SERVICES, LLC. <br> 18000 West Nine Mile Rd, Suite 620, Southfield, Michigan; <br><br> 6829 Queen Anne Court, West Bloomfield, Michigan; <br><br> SAMSUNG GALAXY NOTE20 Ultra 5G, IMEI: 352712280530902 | Case No. <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, Arnold Kusero, Special Agent for the Federal Bureau of Investigation

("FBI"), being duly sworn, depose and state as follows:

## AGENT BACKGROUND AND QUALIFICATIONS

1)      I am a Special Agent with the FBI, duly appointed according to law

and acting as such, and have been employed as such since July 2017. As a Special

Agent in the FBI, I have received general law enforcement training at the FBI

Academy, as well as specialized training about health care fraud, money laundering, and financial crimes from the FBI, and I have been personally involved in investigations concerning health care fraud, illegal health care kickbacks, and methods used to finance and conceal the profits of those operations. I have investigated and conducted surveillance on numerous doctors, pharmacies, and prescription drug dealers. I have consulted with Agents and officers of numerous federal, state, and local agencies in gaining an understanding of current trends in health care fraud. I am currently assigned to the Detroit division of the FBI and my duties include investigating health care fraud, illegal health care kickbacks, and related crimes.

2) As a Special Agent with the FBI, I am responsible for investigating violations of United States federal law, including, but not limited to 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), 18 U.S.C. § 371 (Conspiracy to Defraud the United States and Pay and Receive Illegal Remunerations), 42 U.S.C. § 1320a-7b(b) (Paying and Receiving Remunerations), 21 U.S.C. § 841(a) (Unlawful Distribution of Controlled Substances), 21 U.S.C. § 846 (Conspiracy to Unlawfully Distribute Controlled Substances), and 18 U.S.C. §§ 1956 and 1957 (Money Laundering). In connection with investigating these

offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses.

3)     I, with the assistance of other Health and Human Services—Office of Inspector General ("HHS-OIG") Special Agents and Special Agents from the FBI, am investigating multiple schemes—illegal kickbacks, medically unnecessary services, improper Medicare billing, drug diversion, and money laundering—involving RADWAN MALAS ("MALAS"), owner of INFINITY VISITING PHYSICIAN SERVICES, PLC ("IVPS"), and the following physicians employed by IVPS: (i) DR. ALAN WIDLANSKY ("WIDLANSKY"), (ii) DR. CORNEILUS OPRISIU ("OPRISIU"), (iii) DR. ALEX MATAVERDE ("MATAVERDE"), (iv) DR. LAWRENCE USHER ("USHER"), and (v) DR. HASSAN ABOU-RASS ("ABOU-RASS").

## PURPOSE OF THE AFFIDAVIT

4)     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the premises, (collectively, "Subject Premises"), located at the following addresses within the Eastern District of Michigan:

> (a) INFINITY VISITING PHYSICIAN SERVICES, PLC. 18000 West Nine Mile Rd, Suite 630, Southfield, Michigan (Subject Premises-1);

3

   (b) PINNACLE PHYSICIAN MANAGEMENT SERVICES, LLC. 18000 West Nine Mile Rd, Suite 620, Southfield, Michigan (Subject Premises-2);

   (c) MALAS Residence at 6829 Queen Anne Court, West Bloomfield, Michigan (Subject Premises-3).

 5) This affidavit is further written in support of an application to search the following cellular telephone:

  a) SAMSUNG GALAXY NOTE20 Ultra 5G, IMEI: 352712280530902 ("Subject Telephone").

 6) The Subject Premises and Subject Telephone to be searched are more fully described in the following paragraphs, and in Attachments A-1 through A-4. In Attachments B-1 through B-4, I more fully describe the property, including, but not limited to, documents, patient files, financial records, computers, data, communications, and other evidence, fruits, and instrumentalities of the criminal conduct, to be seized.

 7) As discussed herein, the statements in this affidavit are based upon information that I learned during the investigation, information provided to me by other law enforcement officers, and my experience and background as an FBI Special Agent.  Information pertinent to this investigation was also provided by NCI AdvanceMed (now known as CoventBridge Group), the current unified program integrity contractor in Michigan for the Centers for Medicare and Medicare Services ("CMS"), responsible for performing investigations and audits

4

designed to protect the Medicare program ("Medicare") from fraud, waste, and abuse. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included every fact known to me concerning this investigation. I have only set forth the facts I believe are necessary to establish probable cause to believe that evidence of crime, fruits of crime, contraband, and other items illegally possessed, in violation of federal laws, described more fully below, are located at the Subject Premises and on the Subject Telephone.

## OVERVIEW OF THE INVESTIGATION

8)   In 2019, the FBI and HHS-OIG initiated an investigation into IVPS, MALAS, WIDLANSKY, OPRISIU, MATAVERDE, USHER, ABOU-RASS, and others for their roles in several health care fraud, kickback, and opioid distribution schemes involving various physicians and health care businesses—a toxicology laboratory, a durable medical equipment ("DME") company, and several home health companies—to whom they referred patients, with an actual loss to Medicare of over $23 million.

9)   The investigation identified evidence of the following schemes:

    a) **Illegal Kickbacks** – MALAS received illegal kickbacks from the following business, in exchange for directing IVPS physicians to refer patients for medically unnecessary urine drug testing, DME, and home health services: INTEGRA LAB MANAGEMENT LLC ("INTEGRA"), ALL AMERICAN MEDICAL EQUIPMENT INC. ("AAME"), PREMIER HOME AND HEALTH CARE, INC. ("PREMIER"), DIVINED HOME HEALTH CARE, INC. ("DIVINED"), TRILLIUM HOME

5

CARE SOLUTIONS LLC ("TRILLIUM"), LEGEND HOME CARE, INC. ("LEGEND"), COMMUNITY FIRST HOMECARE, LLC ("COMMUNITY"), GREAT LAKE HOME CARE, LLC ("GREAT LAKE"), and REFLEX HOME CARE, LLC ("REFLEX");

b) **Medically Unnecessary Services** – MALAS ordered IVPS physicians and mid-level practitioners to provide medically unnecessary B-12 injections, Toradol injections, and steroid injections;

c) **Improper Medicare Billing** – MALAS submitted, or caused the submission, of claims to Medicare for services that were not provided as billed, including billing for longer visits than actually provided, and billing for visits provided to deceased beneficiaries;

d) **Improper Opioid Prescribing** – MALAS directed IVPS physicians to prescribe medically unnecessary Schedule II controlled substances to patients to ensure they returned to IVPS and remain available to be billed for services purportedly provided by IVPS; and

e) **Money Laundering** – MALAS received Medicare reimbursements into a bank account for IVPS account, and kickback payments into various other business accounts, which he then transferred into a variety of investment and personal accounts, thereby concealing their nature, source, and identity, as reimbursements and kickback payments associated with the various schemes described herein.

10)    As a result of the fraud, diversion, and kickback schemes, MALAS, by and through IVPS, its physicians, and other business entities, submitted or caused the submission of fraudulent claims to Medicare in the amount of approximately $17,606,051.07, for which Medicare paid approximately

$6,291,881.60. These claims were submitted electronically and reimbursed by Medicare via interstate wire, into an IVPS bank account held in Michigan.

11)    In addition, entities to which IVPS referred medically unnecessary services, and with which MALAS had illegal kickback relationships, including AAME, INTEGRA, DIVINED, TRILLIUM, LEGEND, COMMUNITY, GREAT LAKE, and REFLEX, submitted claims to Medicare referred by IVPS physicians in the amount of approximately $24,275,461.41, for which Medicare paid approximately $17,006,163.39. These claims were submitted electronically and reimbursed by Medicare via interstate wire, into bank accounts held by the various billing entities, all held in Michigan.

12)    The investigation revealed that the Subject Premises contain documents, patient files, computers, currency, and other evidence of these schemes. The investigation further revealed that the Subject Telephone was used by MALAS to perpetrate the various schemes.

13)    As discussed herein, probable cause exists to believe that, at the Subject Premises, and contained on the Subject Telephone, there is located certain items and property, including, but not limited to, documents, patient files, financial records, computers, data, communications, and other evidence and fruits and instrumentalities of violations of:

a)    18 U.S.C. § 1343, Wire Fraud;

7

b)      18 U.S.C. § 1347, Health Care Fraud;

c)      18 U.S.C. § 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud;

d)      42 U.S.C. § 1320a-7b(b)(2)(A), Offering and/or Paying of Kickbacks in Connection with a Federal Health Care Program;

e)      42 U.S.C. § 1320a(b)(1)(A), Soliciting and/or Receiving Kickbacks in Connection with a Federal Health Care Program;

f)      18 U.S.C. § 371, Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks;

g)      18 U.S.C. § 1956, Money Laundering;

h)      18 U.S.C. § 1957, Money Laundering (Spending Statute);

i)      21 U.S.C. § 841(a), Unlawful Distribution of Controlled Substances; and

j)      21 U.S.C. § 846, Conspiracy to Unlawfully Distribute Controlled Substances (collectively, "Subject Offenses")

## RELEVANT STATUTES

14)     18 U.S.C. § 1343 prohibits, upon devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, knowingly transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

8

15)   18 U.S.C. §1347 prohibits knowingly and willfully executing, or attempting to execute, a scheme or artifice—

(1)   to defraud any health care benefit program; or

(2)   to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

16)   18 U.S.C. § 24(b) defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

17)   18 U.S.C. § 1349 provides that any person who attempts or conspires to commit health care fraud or wire fraud, shall be subject to the same penalties as those proscribed in Title 18, United States Code, Sections 1347 and/or 1343.

18)   42 U.S.C. § 1320a-7b(b)(2)(A) prohibits knowingly and willfully offering and paying any remuneration (including any kickback, bribe, or rebate) in return for referring an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or part by a Federal health care benefit program, including Medicare, as defined by 18 United States Code, Section 24(b).

19)     42 U.S.C. § 1320a-7b(b)(1)(A) prohibits the solicitation and receipt of any remuneration, whether direct or indirect, in return for referring an individual to a person for the furnishing or the arranging of furnishing of any service for which payment may be made under a Federal health care program, including Medicare, as defined by 18 U.S.C. § 24(b).

20)     18 U.S.C. § 371 provides that it is a criminal offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."

21)     18 U.S.C. § 1956(a)(1) proscribes conducting or attempting to conduct a financial transaction involving the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represents proceeds of some for unlawful activity—

> (A) with the intent to promote the carrying on of a specified unlawful activity; or
> …
> (B) knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the rouse, the ownership or control of the proceeds of specified unlawful activity.

22)     18 U.S.C. § 1956 sets forth a list of "specified unlawful activities," which includes, "any act or activity constituting an offense involving a Federal health care offense." *See* 18 U.S.C. § 1956(c)(7)(F).

23)     18 U.S.C. §1957 prohibits knowingly engaging in or attempting to engage in a monetary transaction in criminally derived property or a value greater than $10,000 and is derived from specified unlawful activity.

24)     21 U.S.C. § 841 provides that it is a criminal offense to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," except as otherwise authorized by Title 21, Chapter 13, Subchapter I.

25)     21 U.S.C. § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

## THE MEDICARE PROGRAM

### A.     Background

26)     Medicare is a federally funded health care program providing benefits to persons who are over the age of sixty-five or disabled.  Medicare is administered by the CMS, a federal agency within the HHS.  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

27)     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

11

28)     Medicare has four parts: hospital insurance (Part A), medical

insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits

(Part D).

29)     This investigation involves the following medical services, covered by

Medicare Part B:

a)      Ordering of DME, such as arm, leg, back, and neck braces;

b)      Ordering of urine drug testing through a toxicology laboratory;

c)      Ordering of home health care, including physical and occupational
        therapy; and

d)      Evaluation and management services provided by physicians in the
        home, including counseling and injections.

30)     This investigation also involves the distribution of Schedule II

controlled substances, reimbursed through Medicare Part D.

31)     By becoming a participating provider in Medicare, enrolled providers

agree to abide by the policies and procedures, rules, and regulations governing

reimbursement. To receive Medicare funds, enrolled providers, together with their

authorized agents, employees, and contractors, are required to abide by all

provisions of the Social Security Act, the regulations promulgated under the Act,

and applicable policies, procedures, rules, and regulations issued by CMS and its

authorized agents and contractors. Health care providers are given and provided

with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

32) When a provider enrolls in Medicare, Medicare requires the provider to certify that the provider understands that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with the laws, regulations, and program instructions applicable to Medicare, including the Federal Anti-Kickback Statute. A provider also must certify that the provider will not submit, or cause the submission of, false or fraudulent claims. Medicare would not pay claims for services that were not medically necessary, were not provided as represented to Medicare, or procured through kickbacks or bribes, in violation of Title 42, United States Code, Section 1320a-7b(b).

33) Health care providers can only submit claims to Medicare for reasonable and medically necessary services that they rendered.

34) Medicare will only pay for services that are medically necessary and provided as represented. Medicare will not pay for services that are procured by the payment of kickbacks or bribes

35) Medicare regulations require health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom

13

claims for payment were submitted by the physician. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records are required to be sufficient to permit Medicare, CoventBridge, and other contractors, to review the appropriateness of Medicare payments made to the health care provider.

36)     Medicare Part B claims are processed and paid by private insurance organizations, known as fiscal intermediaries, who contract with CMS to administer their specific Medicare part.

37)     Medicare Part D claims are processed through Pharmacy Benefit Managers ("PBMs"), which act on behalf of Medicare drug plans.

38)     As part of the enrollment process, Medicare providers execute an electronic funds transfer ("EFT") agreement which authorizes the provider to receive Medicare payment via electronic funds transfer.

39)     Through the Health Insurance Portability and Accountability Act ("HIPAA") of 1996, Medicare requires a covered entity that bills Medicare, such as a DME supplier, to retain required documentation, including records that disclose the extent of services provided and significant business transactions, for six years from the date of its creation or the date when it was last in effect, whichever is later.

### B.   Medicare Orthotics Requirements

40)   Orthotic devices, or orthoses, are DME items that are applied to the outside of the body to support a body part. They are commonly referred to as "braces." Examples of orthotic devices include back braces, knee braces, ankle braces, wrist/hand supports, and arm/shoulder supports.

41)   Section 1847(a)(2) of the Social Security Act defines Off-The-Shelf ("OTS") orthotics as those orthotics covered by the Act, which require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual. Orthotics that are currently paid for under the Act and are described in the Act are leg, arm, back, and neck braces. The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provides the longstanding Medicare definition of "braces." Braces are defined in this section as "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

42)   To receive reimbursement from Medicare for items such as OTS orthotics, a DME supplier is required to submit a claim, either electronically or in writing, through standard forms, either the Form CMS-1500 or UB-92. Both of these claim forms require important information, including: (a) beneficiary's name and identification number; (b) the name and identification number of the

15

referring/ordering provider who ordered/prescribed the OTS orthotics; (c) the health care benefit item that was provided or supplied to the beneficiary; (d) the billing codes for the specified item; and (e) the date upon which the item was provided or supplied to the beneficiary.

43)    Before submitting a claim to Medicare, a DME supplier must have the following on file: a dispensing order, written order, some type of certificate of medical necessity, and information from the treating physician concerning the patient's condition and diagnosis. The documentation must be maintained in the supplier's files and pursuant to HIPAA, Medicare providers are required to retain required documentation for six years from the date of its creation. A supplier must have a hard copy, faxed, or electronic order in their records before the supplier can submit a claim for payment to Medicare.

44)    A Local Coverage Determination ("LCD") is a published decision made by a Medicare contractor on whether a particular service or item is reasonable and necessary, and therefore covered by Medicare within the specific region the contractor oversees. *See* 42 U.S.C. §1395ff(f)(2)(B).

45)    According to LCD L33318, in place nationally for services performed on or after October 1, 2015, knee braces are medically necessary only where knee instability is documented by an examination of the beneficiary and objective description of joint laxity (e.g., varus/valgus instability, anterior/posterior Drawer

16

test). Claims are not reasonable and necessary if only pain or a subjective description of joint instability is documented.

46) According to LCD L33790, back braces, including Healthcare Common procedure Coding System ("HCPCS")[1] code L0651, are covered only when they are ordered: (1) to reduce pain by restricting mobility of the trunk; (2) to facilitate healing following an injury to the spine or related soft tissues; (3) to facilitate healing following a surgical procedure on the spine or related soft tissue; or (4) to otherwise support weak spinal muscles and/or a deformed spine. The LCD notes "[i]f a spinal orthosis is provided and the coverage criteria are not met, the item will be denied as not medically necessary."

### C. Medicare Urine Drug Testing Requirements

47) Drug testing can be "presumptive" (to determine the presence or absence of an analyte) or "definitive" (to provide a numerical concentration of an analyte). For example, if a patient is prescribed a certain drug, such as Xanax, a positive presumptive test result for benzodiazepines (of which Xanax is one) would be expected. If the test result is negative for benzodiazepines, however, and the patient insists that she is taking her Xanax as prescribed, a definitive laboratory test to confirm whether this unexpected negative result may be reasonable and

---

[1] HCPCS, produced by CMS, is collection of standardized codes that represent medical procedures, supplies, products and services. The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers.

necessary.  Similarly, if a patient's presumptive test yielded a positive result for a non-prescribed or illicit drug, then a definitive laboratory test to evaluate this unexpected positive result may be reasonable and necessary.

48)      Medicare's rules and regulations for urine drug testing, as detailed in LCD L34645, in place in Florida where IVPS had urine samples processed for urine drug testing, provide that definitive testing must be individualized and cannot be based on a panel of testing that is in place for every member of a physician's practice:

> A test may be followed by confirmation with a second method, only if there is a positive or negative inconsistent finding from the qualitative/presumptive test in the setting of a symptomatic patient, as described below.
>
> ***
>
> Definitive drug testing is indicated when:
>
> 1. The results of the screen are presumptively positive.
> 2. Results of the screen are negative and this negative finding is inconsistent with the patient's medical history.
> 3. This test may also be used, when the coverage criteria of the policy are met AND there is no presumptive test available, locally and/or commercially, as may be the case for certain synthetic or semi-synthetic opioids.

49)      The reimbursement rates paid by Medicare for definitive urine drug testing are determined by the number of classes of drugs that are tested.  The billing codes for definitive drug testing range from the lowest reimbursement rate

for 1-7 classes of drugs (Current Procedural Terminology ("CPT")[2] Code G0480), to 8-14 classes of drugs (CPT Code G0481), 15-21 classes of drugs (CPT Code G0482), and the highest reimbursement rate (CPT Code G0483) for more than 22 classes of drugs (classes of drugs include Amphetamines, Barbiturates, Benzodiazepines, Methadone, and Opiates).

### D.    Medicare Home Health Care Requirements

50)    Medicare's regulations for home health services require a home health agency ("HHA") to be licensed by the state in which it is located, submit an application to Medicare, and be certified by a state agency. A qualified HHA receives a Medicare provider number that is used for the submission, processing, and payment of claims associated with home health care.

51)    Medicare coverage for home health services requires that the following qualifying conditions, among others, be met: (a) the Medicare beneficiary is "homebound" and does not have a willing caregiver to assist him or her; (b) the beneficiary needs skilled nursing services, physical therapy, or occupational therapy; (c) the beneficiary is under the care of a qualified physician who established a written Plan of Care for the beneficiary, signed by the physician

---

[2] CPT, developed by the American Medical Association ("AMA"), is a listing of descriptive terms and identifying codes for reporting medical services and procedures that are performed by physicians, and is published in an annually updated book that is referred to as the CPT Code Book.

and by a Registered Nurse ("RN") (or therapist if only therapy services are provided) from the HHA; (d) skilled nursing services are provided by, or under the supervision of, a RN in accordance with the Plan of Care; and (e) the services provided are medically necessary.

52)     A beneficiary is considered "homebound" if he or she has a condition, due to an illness or injury, that restricts his or her ability to leave the home except with the aid of another individual or a supportive device, or if the beneficiary has a condition such that leaving his or her home is medically contraindicated. [3]

53)     To determine the proper level of care for a particular beneficiary, Medicare requires that HHAs perform a comprehensive initial evaluation, which includes a patient-specific, comprehensive assessment that accurately reflects the patient's current health and provides information to measure the patient's progress. Medicare requires that (1) an RN or qualified therapist perform the initial assessment (on an Outcome and Assessment Information Set ("OASIS") form), and (2) HHAs maintain a clinical record of services they provide to each

---

[3] If a beneficiary does in fact leave the home, the beneficiary may nevertheless be considered homebound if the absences from the home are infrequent or for periods of relatively short duration, or are attributable to the need to receive health care treatment. However, occasional absences from the home for nonmedical purposes, e.g., an occasional trip to the barber, a walk around the block or a drive, attendance at a family reunion, funeral, graduation, or other infrequent or unique event would not necessitate a finding that the patient is not homebound if the absences are undertaken on an infrequent basis or are of relatively short duration and do not indicate that the patient has the capacity to obtain the health care provided outside rather than in the home.

beneficiary, including signed and dated clinical and progress notes recording each

home visit made to the beneficiary ("Skilled Nursing Notes"). Skilled Nursing

Notes must include the identity of the individual who performed the visit, the name

of the patient, and the type of service performed. Medicare compensation to HHAs

is based upon a prospective payment system ("PPS"), which pays the HHA a base

payment that can be adjusted to reflect the severity of the beneficiary's condition

and care needs. Medicare PPS pays HHAs for every 60-day "episode" of services

provided to each beneficiary. At the beginning of an episode, Medicare will pay 60

percent of the cost of the episode once the patient has been evaluated and a Plan of

Care determined. At the end of the episode, Medicare pays the balance based on

how much home health care was actually provided in the episode. If the

beneficiary is still eligible for care at the end of the episode, a second episode of

services can be provided. Each subsequent episode must be based upon a new

assessment of the patient, including a new OASIS form, wherein the beneficiary's

physician and RN (or therapist) re-certifies the beneficiary's medical condition,

need for services, and a new Plan of Care.

### E.    Controlled Substance Prescribing and Reporting

54)    The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et. seq*.,

created a comprehensive regulatory regime criminalizing the unauthorized

manufacture, distribution, dispensing, and possession of substances classified in

any of the Act's five schedules.  The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.  Controlled substance pharmaceuticals are listed in Schedules II through V because they are drugs for which there is a substantial potential for abuse and addiction.

55)    Title 21, Code of Federal Regulations, Section 1306.04 explains the requirements for a valid prescription.  It provides that, to be effective, a prescription for a controlled substance:

> must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

56)    As part of this investigation, agents utilized the Michigan Automated Prescription System ("MAPS") to analyze prescription data and trends.  MAPS is an online database, maintained by the Michigan Department of Community Health,

22

which maintains a record of all controlled substance prescriptions that have been written and filled at a pharmacy within the state of Michigan.  MAPS is utilized by law enforcement agencies to assist in their investigations.  Pharmacies are required to input data into MAPS about the patient, prescribing physician, pharmacy that filled the prescription and the details of the controlled substances prescribed.

57)     As described in more detail below, an analysis of MAPS data of physicians at IVPS identified a high utilization of DEA Schedule II substances, compared to other schedules.  In the Affiant's training and experience, this is often indicative of physicians and medical clinics that operate as a "pill mill" with little to no regard for patient health and welfare related to the prescribing of controlled substance.

## **PROBABLE CAUSE**

58)     Probable Cause is established by statements from cooperating witnesses, statements from other witnesses, electronic communications, documentary evidence, Medicare records, and financial records.

### A.     **Statements from Cooperating Witnesses**

#### 1.  **Statements from ABOU-RASS**

59)     Agents interviewed ABOU-RASS on several occasions between December 30, 2019, and November 8, 2021, both voluntarily and pursuant to a proffer letter. ABOU-RASS was charged on October 5, 2021, under seal, with one

23

count of Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. §

1349, for his participation in the scheme described herein. He pleaded guilty, under

seal, to Count 1 on October 21, 2021. He provided the following information to

agents:

60)     ABOU-RASS was a physician employed by IVPS from

approximately 2015 through June 2019. He was hired by MALAS and reported

directly to MALAS. Throughout his employment, ABOU-RASS was pressured by

MALAS to engage in conduct that he knew to be wrong. MALAS threatened

ABOU-RASS's employment, salary, and benefits, such as vital health care

insurance, if he did not engage in the conduct. As a result of this pressure, ABOU-

RASS followed MALAS's orders.

***Referral of Medically Unnecessary Services***

61)     ABOU-RASS, at MALAS's direction, certified patients for home

health care who did not qualify because they were not homebound. ABOU-RASS

estimates that about 90% of IVPS's patients he saw were sent to IVPS by home

health companies, to be certified for home health care by IVPS physicians,

regardless of medical necessity. MALAS told ABOU-RASS on several occasions

"if we [IVPS] do not order home care, they [home health companies] won't send

us patients."

24

62)     ABOU-RASS, at MALAS's direction, prescribed DME to patients who did not need it. MALAS directed all IVPS providers to prescribe back and knee braces to anyone with diagnosed back or knee pain, regardless of medical necessity. In some instances, MALAS ordered ABOU-RASS to sign DME prescriptions for patients despite ABOU-RASS not having evaluated the patients.

63)     WIDLANSKY, another IVPS physician, routinely reviewed ABOU-RASS's patient notes to determine which patients could be prescribed DME. He approached ABOU-RASS nearly every other day, at MALAS's direction, and asked ABOU-RASS to prescribe DME to patients with back pain and knee pain, despite not needing braces. ABOU-RASS understood the direction to come from MALAS and would eventually write the prescriptions.

64)     Patients routinely told ABOU-RASS that they received back and knee braces they did not need or that did not fit correctly, making them unusable.

65)     ABOU-RASS, at MALAS's direction, signed physician orders for urine drug testing that were pre-marked for the higher-reimbursing "comprehensive" urine drug testing, when that was not medically necessary.

66)     MALAS reviewed ABOU-RASS's patient notes to confirm that urine drug testing, home health care, DME, and other services had been ordered by ABOU-RASS. If they had not been ordered, MALAS would give ABOU-RASS stacks of orders to sign, despite ABOU-RASS not believing the services to be

25

medically necessary, and ABOU-RASS would sign them eventually, under the pressure of MALAS.

67)     In instances where ABOU-RASS did not prescribe as directed by MALAS, MALAS would give the orders to MATAVERDE or a nurse practitioner to sign, despite them not having seen ABOU-RASS's patients.

***Improper Prescribing of Schedule II Controlled Substances***

68)     ABOU-RASS, at MALAS's direction, prescribed Schedule II controlled substances to patients who did not need it, so that the patients would agree to continue to receive services from IVPS.

69)     JINKY CUPINO, IVPS office manager, specifically told ABOU-RASS he should try to keep IVPS patients happy by prescribing them narcotics and referring them for home health care services.

70)     ABOU-RASS was threatened by MALAS if he refused to order DME and prescribe narcotics for IVPS patients. MALAS stated that he would cut ABOU-RASS' pay and take away his car and medical insurance.

71)     MALAS fired ABOU-RASS once in 2017 after he refused to write a controlled substance prescription for an IVPS patient, but ABOU-RASS was immediately re-hired after acquiescing to MALAS's request.

***Illegal Kickbacks***

72)    ABOU-RASS also recalled that while working at IVPS, ABBAS

GINAI ("GINAI"), the owner of AAME boasted that he had paid MALAS "over

$107,000" in kickbacks in exchange for DME referrals.

***Improper Billing***

73)    ABOU-RASS recalled MALAS telling IVPS staff during every staff

meeting beginning in 2018, that IVPS was not making enough money by seeing

patients alone and that IVPS staff needed to start adding additional services to the

billing sheets.

74)    In particular, MALAS ordered ABOU-RASS to indicate every patient

visit as a 60-minute visit, despite ABOU-RASS almost never spending 60 minutes

with a patient.[4]

75)    In 2018, ABOU-RASS was told by an IVPS medical assistant that

MALAS had ordered all medical assistants to provide B-12 and Toradol shots,

billable to Medicare, to all patients, regardless of whether ordered by the

---

[4] Medicare data shows that between January 1, 2017, and July 31, 2019, the top reimbursing code billed for services provided by ABOU RASS, was for 60-minute home visits. IVPS submitted 4,449 claims for 1,044 beneficiaries, to Medicare for 60-minute visits purportedly provided by ABOU-RASS, billing Medicare for $1,302,485.00 and being reimbursed $545,154.86 on these claims.

physicians, and that these shots were being given to ABOU-RASS's patients without his order or consent.[5]

76)    ABOU-RASS was aware of steroid injections that OPRISIU was administering to IVPS patients. MALAS referred to the shots administered by OPRISIU as a "gold mine" because they increased the amount of billing per beneficiary.

77)    MALAS told ABOU-RASS that OPRISU was able to generate more money for IVPS by seeing 10 patients than ABOU-RASS could generate by seeing 20 patients, because of billing for the steroid injections.

***Subject Premises***

78)    During ABOU-RASS's entire tenure, the physical location of the IVPS office was 5245 Schaefer Road, Suite D, in Dearborn Michigan. He is aware, through speaking with former colleagues, that IVPS has moved office locations to Subject Premises-1 and Subject Premises-2.

79)    ABOU-RASS was aware that during his tenure at IVPS, MALAS used cameras within the office to record his employees. The office itself was equipped with filing cabinets to maintain the physical patient files and records, a

---

[5] Medicare data shows that between January 1, 2017, and July 31, 2019, of the 1,775 Medicare beneficiaries who received services from ABOU-RASS, IVPS billed 1,084 at least once for receipt of a B-12 injection, resulting in 5,374 claims. IVPS also billed 592 beneficiaries for Toradol injections, resulting in 2,172 claims.

copier and scanner to scan records into the electronic medical records ("EMR") system, several computers, and between five and six laptops.

80)     ABOU-RASS witnessed both MALAS and WIDLANKSY leave the office with laptops and is aware that MALAS utilized his laptop to conduct business from home based on phone conversations that he had with MALAS while MALAS was at his home residence, Subject Premises-3.

### 2. Statements from TEOFIL GHERASIM

81)     Agents interviewed GHERASIM on several occasions between April and November 2021, both voluntarily and pursuant to a proffer agreement. GHERASIM was charged on October 18, 2021, under seal, with one count of Conspiracy to Defraud the United States and Pay and Receive Kickbacks, in violation of 18 U.S.C. § 371, for his participation in the scheme described herein. He pleaded guilty, under seal, to Count 1 on November 9, 2021. GHERASIM was a co-owner of INTEGRA, which provided toxicology services for IVPS.

***Illegal Kickbacks***

82)     GHERASIM stated MALAS received payment from INTEGRA owners, who agreed to pay MALAS in exchange for urine samples and physician orders for comprehensive urine drug testing from IVPS, regardless of medical necessity.

83)     In negotiations between INTEGRA and MALAS, in or around February 2018, MALAS told GHERASIM and his co-owners that he would provide almost exclusively physician orders for "comprehensive" urine drug testing, the highest reimbursing drug testing panel by Medicare.

84)     Between March 2018 and March 2019, GHERASIM and his co-owners, by and through INTEGRA, paid MALAS $129,600 for physician orders for comprehensive urine drug testing, which were subsequently billed to Medicare for reimbursement by INTEGRA, during which time nearly all of the referrals for urine drug testing to INTEGRA by IVPS physicians were for "comprehensive" urine drug testing.[6]

85)     GHERASIM was aware that MALAS had a standing order to all physicians to always order "comprehensive" urine drug testing. On one occasion, GHERASIM witnessed ABOU-RASS arguing with MALAS about the over-utilization of the "comprehensive" urine drug testing.

***Money Laundering***

86)     INTEGRA paid MALAS through a management company, Pegasus Management Associates, LLC ("PEGASUS"), which is solely owned by MALAS.

---

[6] Medicare data shows that of the 1,853 claims submitted by INTEGRA for urine drug testing referred by IVPS providers, 1,812 (approximately 97.8%) were for "comprehensive" urine drug testing, billed under CPT Code G0483.

***Medically Unnecessary Services***

87)     After March 2019, GHERASIM continued to interact with MALAS as a representative for a blood testing company. He continues to interact with him at present.

88)     During these interactions, MALAS told GHERASIM that he (MALAS) used a performance point system to evaluate his employees. The employees received points for the number of B-12 shots, Toradol injections, and other diagnostics administered to patients.

89)     GHERASIM witnessed MALAS pressure his physicians to order more urine drug testing and DME. He heard MALAS, on several occasions, tell IVPS physicians that he would rather they bill for fewer, but more expensive services, than more lower reimbursing services, regardless of medical necessity.

***Improper Prescribing of Schedule II Controlled Substances***

90)     GHERASIM, as part of INTEGRA's relationship with IVPS, was aware of the prescribing patterns, and described it as "one of the worst" in prescribing controlled substances. GHERASIM estimated that nearly half of IVPS patients were prescribed some Schedule II controlled substance.

91)     Based on his experience, GHERASIM believed IVPS patients were drug seeking. INTEGRA medical assistants, who were responsible for collecting urine samples at the homes of IVPS patients, complained to GHERASIM that the

patients demanded controlled substances, were erratic, and cursed at the medical assistants.

92) In working with IVPS, GHERASIM interacted with nearly all of the physicians and support staff. He positively identified WIDLANSKY, MATAVERDE, ABOU-RASS, USHER, and OPRISIU, as physicians he interacted with at IVPS. He identified MATAVERDE as the supervising physician.

***Subject Premises***

93) GHERASIM is aware that in the fall of 2020, IVPS moved from the location at 5245 Schaefer Road, Suite D, in Dearborn Michigan, to Subject Premises-1 and Subject Premises-2. GHERASIM has visited Subject Premises-1 and Subject Premises-2 on several occasions. He conducted two consensual recordings, described in detail below, in which Subject Premises-1 and Subject Premises-2 are shown to house computers, laptops, filing systems, electronic medical records systems, compliance records, and copy and fax machines.

### 3. Statements from DIANE DUPREE KING ("KING")

94) Agents interviewed KING in October 2021, pursuant to a proffer agreement. KING was charged with eight counts of committing Health Care Fraud, in violation of 18 U.S.C. § 1347. She has signed a plea agreement as to one count, and a cooperation agreement. During interviews she told agents the following:

95)     KING owned and operated two adult daycares, Prestige Behavioral

Therapy Development Center LLC and Prestige Creative Arts Therapy LLC,

together referred to as "Prestige," from January 2016 through June 2021.

96)     During the period KING owned and operated Prestige, she received

kickback payments from the owners of COMMUNITY, an HHA. KING referred

patients from the Prestige facilities to COMMUNITY and in return, received $500

per patient referred from the owners of COMMUNITY.

### *Referral of Medically Unnecessary Services*

97)     In addition to referring patients to COMMUNITY, KING also

allowed the patients to be seen at the Prestige facilities by IVPS physicians. KING

was told by a COMMUNITY owner to coordinate with IVPS and MALAS to have

the patients seen and be referred to COMMUNITY for various home health care

services.

98)     KING coordinated with IVPS and MALAS to arrange for physicians

to visit the referred patients at a Prestige facility. KING arranged to have 10-12

patients seen at a time by the IVPS physicians. Physicians would see between 10-

12 patients in 90 minutes (average of nine minutes per patient) and would refer

them to COMMUNITY for home health care services.

99)     KING witnessed that many of the patients referred by IVPS physicians to COMMUNITY for home health care services were not homebound and did not qualify for home care.[7]

100)    She met with MALAS on multiple occasions at Starbucks, at his office, and his medical clinic, to discuss their business relationship.

### Illegal Kickbacks

101)    Prior to opening Prestige in 2016, KING also referred patients to MALAS's previous home health company, Dependable Home Care, and was paid kickbacks by MALAS for the referrals. She specifically referred Medicare patients to Dependable Home Care, at MALAS's request. MALAS told KING that Medicare paid more for home health care than other insurers so he only wanted Medicare referrals.

102)    KING specifically stated she was paid kickbacks by MALAS and others in exchange for referring patients to companies owned by MALAS.

---

[7] Medicare Data shows that between June 2016 and October 2020, COMMUNITY submitted approximately 19,115 claims for home health services referred by ABOU-RASS, WIDLANSKY, USHER, MATAVERDE, and OPRISIU, during the period of time they were employed by IVPS. COMMUNITY billed Medicare approximately $3,642,765.41 on these claims and was reimbursed $3,124,165.41.

### B.    Statements from Witnesses

### 1. Statements from Medicare Beneficiaries

### a. R.F.

103)    Federal agents interviewed Medicare beneficiary R.F., a resident of the Eastern District of Michigan. Beneficiary R.F. told Affiant that R.F. received home visits by a doctor only twice several years ago. The two visits lasted no more than 30 minutes each.

104)    Medicare data shows that IVPS submitted 12 claims for services provided by WIDLANSKY, in six separate visits, for services provided to beneficiary R.F. IVPS submitted claims for three home visits—on November 11, 2016 (75 minutes), December 20, 2016 (60 minutes), and March 31, 2017 (60 minutes)—and three office visits—on November 29, 2017, December 14, 2016, and January 26, 2017, each for home health certifications. In total, IVPS submitted claims to Medicare for $1,765 on behalf of beneficiary R.F., and was paid $713.38.

105)    Agents showed beneficiary R.F. an unmarked driver's license photograph of WIDLANSKY. Beneficiary R.F advised that R.F. had never seen the individual pictured in the photograph before.

106)    Beneficiary R.F. told Affiant that R.F. has never heard of IVPS.

35

### b.  C.A.

107)   Federal agents interviewed Medicare beneficiary C.A., a resident of the Eastern District of Michigan. Beneficiary C.A. told Affiant that C.A. received home visits by USHER in the past few years. These visits were often about 30 minutes long and never over an hour.

108)   Medicare data shows that IVPS submitted 39 claims for services provided by USHER, in 13 separate visits, between November 2019 and December 2020, for services provided to beneficiary C.A. On at least the following four occasions, IVPS submitted claims for visits of 60 minutes or more provided by USHER to beneficiary C.A.: November 26, 2019 (two claims for 75 minutes and 60 minutes, respectively), January 3, 2020 (60 minutes), January 31 (60 minutes), and March 3, 2020 (60 minutes). In total, IVPS submitted claims to Medicare for $1,600 on behalf of beneficiary C.A., and was paid $587.55.

109)   Medicare Part B data indicates beneficiary C.A had nine home visits and one telehealth visit with USHER.

### c. M.M.

110)   Federal agents interviewed Medicare beneficiary M.M., a resident of the Eastern District of Michigan. Beneficiary M.M. told Affiant that M.M. received home visits by a doctor OPRISIU for the past several years.

111)   M.M. stated most of M.M.'s home visits with OPRISIU averaged around 30 to 40 minutes. Medicare Part B data indicates between May 2017 and at least January 2021, IVPS billed at least 23 separate claims for 60-minute home visits on behalf of beneficiary M.M. purportedly provided by OPRISIU. IVPS billed Medicare approximately $7,645 on these claims, and was reimbursed $2,932.26.

112)   Medicare Part B data also indicated that IVPS submitted 12 claims for various services provided by ABOU-RASS to beneficiary M.M. on April 27, 2016, and June 8, 2016. IVPS billed Medicare approximately $1,675 on these claims, and was reimbursed $1,006.96.

113)   Agents showed beneficiary M.M. an unmarked driver's license photograph of ABOU-RASS. A.W. advised the individual pictured in the photograph did not look familiar.

### d. A.W.

114)   Federal agents interviewed Medicare beneficiary A.W., a resident of the Eastern District of Michigan. Beneficiary A.W. told Affiant that A.W. received two home visits from IVPS' physicians, each lasting approximately 40 minutes. Medicare Part B data shows that IVPS submitted claims for five patient visits purportedly provided by WIDLANSKY and ABOU-RASS, three of which—on August 18, 2016, September 29, 2016, and November 8, 2016—were for visits 60

minutes or greater. IVPS billed Medicare $1,220 for these claims, and was reimbursed $824.93.

115)   Beneficiary A.W. told Affiant that A.W. has never received injections during home visits. Medicare Part B data indicates A.W. received three injections of vitamin b-12 cyanocobalamin, up to 1000 mcg billed as if administered by WIDLANSKI. IVPS billed the injections to Medicare as if administered on August 18, 2016, September 29, 2016, and November 8, 2016. Medicare Part B data further indicates A.W. received one injection of vitamin b-12 cyanocobalamin, up to 1000 mcg administered by ABOU-RASS. The injection was billed as if administered on December 15, 2016.  The total amount IVPS billed to Medicare for these services was $30, for which it was reimbursed $14.78.

116)   Agents showed beneficiary A.W. an unmarked driver's license photograph of ABOU-RASS. A.W. advised she did not recognize individual pictured in the photograph.

## 2. Other Witness Statements

### a. Statements from MICHAEL MOLLOY

117)   On April 26, 2021, Agents interviewed MICHAEL MOLLOY ("MOLLOY"), a partial owner of INTEGRA, pursuant to a proffer agreement. MOLLOY stated MALAS was paid approximately $10,000 dollars monthly by INTEGRA through a third-party company named PEGASUS in exchange for

MALAS generating business for INTEGRA by having IVPS drug screenings for patients referred to INTEGRA.

*Illegal Kickbacks*

118)   MOLLOY stated specifically that the kickback payments were paid to MALAS because he increased INTEGRA's business. The idea was to increase profitability by billing Medicare.

119)   MOLLOY stated the payments to MALAS were for the purpose of generating revenue from Medicare for toxicology claims.

120)   On April 26, 2021, MOLLOY stated MALAS and INTEGRA owners agreed to pay the salary and expenses of a medical assistant to work for IVPS. The agreement was a way for INTEGRA to "take in costs for IVPS." Based on your Affiant's training and experience, these types of arrangements are a scheme to pay and receive illegal kickbacks and bribes in exchange for urine samples and physician orders for urine drug testing for the purpose of billing Medicare.

### a.  Statements from GINAI

121)   GINAI was interviewed voluntarily, on September 29, 2021, and told agents the following:

122)   GINAI is the owner and operator of AAME beginning in March 2017, and continuing to present. AAME is a DME company which delivers back braces,

knee, braces, and diabetic shoes to patients. GINAI submitted claims to Medicare on behalf of AAME during this period.

123)   GINAI began working with MALAS in October 2018. In November 2018, MALAS asked GINAI to pay for ABOU-RASS's health insurance in exchange for referrals to AAME. MALAS told GINAI that this was not a kickback because the payments would be for ABOU-RASS, not MALAS.

***Illegal Kickbacks***

124)   While GINAI refused to pay the health insurance payments, financial records, described in more detail below, show that each month, between March 2018 and November 2018, GINAI signed checks valued at $9,200 from an AAME bank account and deposited the same into a bank account for Quality First Urgent Care, a company owned by MALAS, and for which the account he is the sole signatory.

125)   Medicare claims data indicates that from January 2017 through September 2020, AAME submitted approximately 1,697 claims to Medicare for DME ordered by IVPS physicians, billing Medicare for approximately $576,351.95 on these claims. An analysis of Medicare data and interviews with Medicare beneficiaries, described below, evidence AAME's submission of claims to Medicare for DME that was medically unnecessary and/or not provided.

### *Referral of Medically Unnecessary DME*

126)   GINAI told agents that the DME delivered by AAME was "all a scam" and stated that DME does not "help any of the patients."

127)   GINAI described that on one occasion he delivered a knee brace to a patient he witnessed running easily up and down stairs. On another occasion, he also delivered diabetic shoes to patients who did not have calluses on their feet.

128)   It was GINAI's understanding that physicians were required to perform specific tests before DME was prescribed. He observed that IVPS physicians did not conduct these specific tests prior to prescribing DME.

129)   Patients also informed GINAI that physicians did not spend much time with them; describing the physicians as being "in and out" the patients' homes.

130)   In addition to working with MALAS, GINAI worked with ABOU-RASS, WIDLANSKY, USHER, and OPRISIU.

### C.   Electronic Communications

131)   On June 24, 2021, Google produced e-mails related to MOLLOY's Gmail account, mjMOLLOY@integralabsolutions.com, pursuant to a search warrant signed by U.S. Magistrate Judge Morris in the Eastern District of Michigan. The records confirm MALAS engaged in negotiations with

41

GHERASIM, MOLLOY, and the other co-owners of INTEGRA, for the payment

of kickbacks to MALAS for the referral of urine samples for urine drug testing.

The e-mails include the following:

- On January 13, 2018, MOLLOY sent MALAS (radwanmalas@gmail.com) an "Employment Agreement" to provide services on behalf of INTEGRA. MALAS (radwanmalas@gmail.com) responded on February 13, 2018 with a copy of the agreement and his contact information, identifying himself as "Infinity Visiting Physicians Managing Partner," with a cell phone number of (248) 854-5357, the number associated with the Subject Telephone. On February 14, 2018, MOLLOY, sent MALAS's information to GHERASIM.

- On February 13, 2018, MALAS (radwanmalas@gmail.com) sent MOLLOY and GHERASIM an alternative agreement.

- On March 16, 2018, INTEGRA co-owners (including MOLLOY and GHERASIM) sent an e-mail to MALAS (radwanmalas@gmail.com) attaching a proposed lab marketing services agreement, between INTEGRA and PEGASUS, a company solely owned by MALAS.

- After several back and forth e-mails between the INTEGRA co-owners and MALAS, on March 19, 2018, MALAS (radwanmalas@gmail.com) sent an e-mail to the INTEGRA owners stating "sounds good . . . it looks like we are good. Please make the adjustments and send it over so I can sign it."

- On May 25, 2018, INTEGRA co-owners (including MOLLOY and GHERASIM) sent an e-mail to MALAS (radwanmalas@gmail.com) attaching the May 2018 list of patients referred to INTEGRA by IVPS physicians, including OPRISIU, MATAVERDE, and ABOU-RASS.

132)   KING used e-mail communications to interact with MALAS and

provide lists of patients to be seen by IVPS physicians and referred for home

health care. She provided the following electronic communications to the United

States:

- On February 27, 2018, KING sent an e-mail to MALAS (rmalas@ivphysicians.com), with a list of patients to be seen and who were previously seen.

- On July 12, 2018, MALAS responded to a list of patients sent by KING (from account radwanmalas@gmail.com), with the subject line "Doctor list for Warren Office." MALAS stated, "Dr. Widlansky will be the Doctor to see them and Dr. Magalheas will help out whenever it is needed. Dr. Widlansky usually sees 5 to 6 at a time."

**D.   Medicare Evidence**

**1.  Medicare Data**

**a.  Billing for Medically Unnecessary Services**

133)   Medicare Part B data shows that from March 2015 through present, IVPS submitted approximately 68,223 claims for roughly 5,048 patients that totaled approximately $17,606,051.07 in claims. IVPS was paid approximately $6,291,881 by Medicare for these claims.

134)   All claims were submitted by IVPS electronically to Medicare and all reimbursements from Medicare to IVPS were disbursed via interstate wire to a bank account in Michigan, held in the name of IVPS.

8)   Medicare Part B data shows that from March 2015 through present, IVPS submitted over 17,000 claims for 60-minute established patient visits,

43

totaling $5,170,030 in claims and was paid $2,124,888.74 on these submitted claims by Medicare.

9)     Medicare Part B data shows that from March 2015 through present, IVPS submitted over 17,000 claims for injections beneath the skin, including Toradol injections.  These claims totaled $885,817 and IVPS was paid $291,339.74 on these claims by Medicare.

10)     Medicare Part B data shows that from March 2015 through present, IVPS submitted over 15,000 claims for vitamin B-12 injections, totaling $233,765 and was paid $23,233.44 on these claims by Medicare.

### b.  Billing for Deceased Beneficiaries

11)     Medicare Part B data shows that between March 2015 and February 2021, IVPS submitted 98 claims, totaling $22,810, for 62 beneficiaries for services provided after the beneficiaries date of death.

### c.  IVPS Referrals

135)   Medicare Part B data shows that claims for the following approximate amounts were billed to, and reimbursed by, Medicare by the listed entities based on referrals from the enumerated IVPS physicians:

| | TOTAL | ABOU-RASS | OPRISIU | MATAVERDE | WIDLANSKY | USHER |
|---|---|---|---|---|---|---|
| **AAME** | | | | | | |
| Billed Amount | $1,912,597.00 | $294,909 | $23,190 | $2,705 | $315 | $103,540 |
| Paid Amount | $264,708.82 | $191,494.87 | $8,975.97 | $1,838.21 | $76.79 | $62,322.98 |
| | | | | | | |
| **INTEGRA** | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Billed Amount | $3,664,263 | $1,912,597.00 | $887,620.00 | $864,046.00 | | |
| Paid Amount | 945,252.15 | $503,653.68 | $219,047.88 | $222,550.59 | | |
| | | | | | | |
| **PREMIER** | | | | | | |
| Billed Amount | $7,713,395 | $4,547,730.98 | $567,131.38 | $2,225,407.37 | $10,214.26 | $362,911.73 |
| Paid Amount | $6,629,219 | $3,789,014.93 | $463,124.07 | $2,008,439.92 | $10,061.86 | $358,578.36 |
| | | | | | | |
| **DIVINED** | | | | | | |
| Billed Amount | $2,459,272.06 | $1,191,838.87 | $378,405.26 | $758,152.33 | $9,450.03 | $121,425.57 |
| Paid Amount | $2,135,131 | $995,212.77 | $344,349.72 | $671,827.10 | $8,997.98 | $114,743.37 |
| | | | | | | |
| **TRILLIUM** | | | | | | |
| Billed Amount | $550,570.55 | $364,487.73 | $50,200.18 | $96,157.17 | $39,725.47 | |
| Paid Amount | $478,194.14 | $315,295.11 | $48,554.05 | $76,095.71 | $38,249.27 | |
| | | | | | | |
| **LEGEND** | | | | | | |
| Billed Amount | $690,405.88 | $97,443.01 | $424,396.68 | $140,530.76 | $28,035.43 | |
| Paid Amount | $532,197 | $86,293.49 | $322,486.35 | $107,758.79 | $15,657.90 | |
| | | | | | | |
| **COMMUNITY FIRST** | | | | | | |
| Billed Amount | $3,589,115.25 | $1,919,950.60 | $420,119.80 | $1,046,916.20 | $93,644.08 | $108,484.57 |
| Paid Amount | $3,015,102.56 | $1,583,155.87 | $375,122.80 | $871,347.56 | $86,252.30 | $99,224.03 |
| | | | | | | |
| **GREAT LAKES** | | | | | | |
| Billed Amount | $2,719,267.30 | $1,018,383.17 | $325,671.28 | $1,161,886.45 | $189,126.24 | $24,200.16 |
| Paid Amount | $2,162,626.06 | $826,428.49 | $284,124.17 | $892,611.49 | $136,990.54 | $22,471.37 |
| | | | | | | |
| **REFLEX** | | | | | | |
| Billed Amount | $976,575.37 | $266,405.24 | $74,350.31 | $548,367.66 | $56,187.18 | $31,264.98 |
| Paid Amount | $843,733.19 | $239,590.64 | $68,215.09 | $460,073.77 | $52,769.21 | $23,084.48 |
| | | | | | | |
| **TOTAL LOSS** | | | | | | |
| Billed Amount | $24,275,461.41 | $11,613,745.60 | $3,151,084.89 | $6,844,168.94 | $426,697.69 | $751,827.01 |
| Paid Amount | $17,006,163.39 | $8,530,139.85 | $2,134,000.10 | $5,312,543.14 | $349,055.85 | $680,424.59 |

## 2.  Medicare Enrollment Applications

136)   MALAS enrolled IVPS with Medicare in January 2015. He submitted a CMS-855 enrollment application, listing himself as the delegated official. MALAS signed the application on January 4, 2015.

137)   MALAS submitted a CMS-855 re-enrollment application on behalf of IVPS to Medicare in March 2016, changing the address for IVPS to 5245 Schaefer Road, Suite D, in Dearborn, Michigan, and listing the contact e-mail address as radwanmalas@gmail.com. He listed the biller as Adrian Schoenherr. He signed the application on March 3, 2016.

138)   MALAS submitted a CMS-855 re-enrollment application on behalf of IVPS to Medicare on September 16, 2020, listing himself as the managing partner and delegated official for IVPS, himself as the contact person, radwanmalas@gmail.com as the contact e-mail address, the phone number associated with the Subject Telephone as his contact number, and Subject Premises-1 as the new business address. MALAS also listed Subject Premises-1 as the location of medical record storage. Finally, the application lists the new billing agency as Pinnacle Physician Management Services, LLC. ("PPMS"), located at Subject Premises-2, next door to Subject Premises-1. Adrian Schoenherr is listed as a contact person for both IVPS and PPMS. MALAS signed the application on September 16, 2020.

139)   For each of the re-enrollment applications submitted by MALAS to Medicare, he certified and agreed to terms and conditions of participation in Medicare, including his understanding that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with the laws, regulations, and program instructions applicable to Medicare, including the Federal Anti-Kickback Statute.

### E. Schedule II Controlled Substance Prescribing

140)   Analysis of MAPS data identified the following high utilization for Schedule II controlled substances by physicians at IVPS:

141)   According to MAPS, from December 8, 2016, through December 7, 2020, while employed by IVPS, OPRISIU prescribed approximately 5,311 total controlled substance prescriptions or 307,552 total dosage units ("DUs"). Of this, 32.26% (1,776 total scripts/99,220 DUs) were Schedule II controlled substances. This included approximately 1,144 prescriptions or 64,736 DUs (21.04%) of Hydrocodone/Acetaminophen, 483 prescriptions or 29,292 DUs (9.52%) of Oxycodone, and 74 prescriptions or 4,282 DUs (1.39%) of Oxycodone/Acetaminophen.

142)   According to MAPS, from December 8, 2016, through December 7, 2020, while employed by IVPS, USHER prescribed approximately 4,956 total controlled substance prescriptions or 311,779 total DUs. Of this, 45.91% (2,505

total scripts/143,168 DUs) were Schedule II controlled substances. This included approximately 1,535 prescriptions or 85,959 DUs (27.57%) of Hydrocodone/Acetaminophen, 415 prescriptions or 28,551 DUs (9.15%) of Oxycodone/Acetaminophen, and 401 prescriptions or 22,330 DUs (7.16%) of Oxycodone.

143)   According to MAPS, from December 8, 2016, through December 7, 2020, while employed by IVPS, MATAVERDE prescribed approximately 5,633 total controlled substance prescriptions or 490,007 total DUs. Of this, 47.46% (2,846 total scripts/232,590 DUs) were Schedule II controlled substances. This included approximately 1,131 prescriptions or 93,113 DUs (19.00%) of Oxycodone, 1,057 prescriptions or 94,492 DUs (19.28%) of Hydrocodone/Acetaminophen, and 364 prescriptions or 30,717 DUs (6.26%) of Oxycodone/Acetaminophen.

144)   According to MAPS, from December 9, 2016, through December 7, 2020, while employed by IVPS, ABOU-RASS prescribed approximately 5,090 total controlled substance prescriptions or 363,669 total DUs. Of this 44% (2,415 total scripts/160,189 DUs) were Schedule II controlled substances. This included approximately 1,321 prescriptions or 88,801 DUs (55.43%) of Hydrocodone/Acetaminophen, 779 prescriptions or 49,750 DUs (30.05%) of

Oxycodone, and 237 prescriptions or 17,268 DUs (10.77%) of
Oxycodone/Acetaminophen.

145)   Based on my training and experience the number of Schedule II
controlled substances proscribed by OPRISIU, USHER, MATAVERDE, and
ABOU-RASS, as providers employed by a general medical practices, as opposed
to a medical practice specializing in pain management, is indicative of over-
prescribing and often coincides with the diversion of these drugs.

### F.  Financial Records

146)   Financial records obtained via subpoena identify the accounts into
which MALAS received Medicare reimbursements and illegal kickbacks
payments, and also show the flow of funds into personal accounts, including
investment accounts.

147)   Bank records subpoenaed from JP Morgan Chase, show that between
March 2015 and April 2021, IVPS JP Morgan Chase Bank Account No. 0302,
received nearly $6.5 million in Medicare reimbursements. MALAS was a
signatory on this account, beginning in October 2014. ABOU-RASS was added as
a signatory in April 2015.

148)   Bank records subpoenaed from PNC Bank, show that between March
2018 and March 2019, 12 checks were written from INTEGRA's PNC Bank
Account No. 8964 to PEGASUS. Each check was written in the amount of

49

$10,800. Bank records subpoenaed from JP Morgan Chase, show that PEGASUS's JP Morgan Chase Bank Account No. 0069, had one signatory: MALAS.

149)   Bank records subpoenaed from Comerica Bank, show that between March 2018 and November 2018, eight checks were written from AAME's Comerica Bank Account No. 7864, to Quality First Urgent Care PLLC. The first check was written in the amount of $1,200 with the remaining checks written in the amount of $1,000, and signed by GINAI. Bank records subpoenaed from JP Morgan Chase, show that Quality First Urgent Care's JP Morgan Chase Bank Account No. 9155, had one signatory: MALAS.

150)   Between March 2015 and April 2021, MALAS transferred approximately $1 million from J.P. Morgan Chase Account No. 0302 into both business and personal accounts for which he was the signer, and from there into other personal and investment accounts. In particular, between March 2015 and April 2021, he transferred approximately $371,000 to PEGASUS's JP Morgan Chase Bank Account No. 0069, the same account into he which he received $129,000 in kickbacks from INTEGRA. From there, he transferred approximately $400,000 into investment accounts through Robinhood Financial Services, LLC, a personal stock trading service.

151)   In addition, between March 2015 and April 2021, MALAS authorized approximately $403,172.11 in payments to personal credit cards held in his name

out of the IVPS J.P. Morgan Chase Bank Account No. 0302, including nine
transactions over $10,000.

152)   Based on my training, experience, and participation in financial
investigations involving the concealment of funds and assets to prevent detection
by law enforcement agencies, MALAS's transactions are consistent with
"concealment money laundering," whereby individuals often use illegal proceeds
to facilitate the operation of their illegal activities through concealing or disguising
the funds by changing their form. Individuals attempting to conceal their income or
illegal activities frequently transfer assets to entities and corporations otherwise not
directly involved in the fraud to avoid detection of those assets, like PEGASUS in
this case, by the IRS and other government agencies.

153)   Further, MALAS's use of illegal proceeds in transactions over
$10,000 (including the payment of personal credit cards), also constitutes a
violation of the spending statute, and is also considered money laundering.

### G. Corporate records

154)   According to corporate documents from the Michigan Licensing and
Regulatory Affairs ("LARA"), IVPS is a domestic corporation incorporated in
January 2014, with Ammar Sukari listed as the Resident Agent. MALAS was
listed as the Resident Agent and Authorized Agent of IVPS.

155)   On or about October 26, 2016, a Certificate of Change of Registered Agent was filed with LARA, replacing the registered agent as ABOU-RASS, and listing him as President of IVPS. ABOU-RASS told agents that at no time was he the president of IVPS and that he did not affix his signature to the Certificate.

156)   On or about February 2, 2017, an Annual Report was submitted to LARA for the 2016 calendar year. It listed the members and managers as ABOU-RASS and MALAS, and was purportedly signed by ABOU-RASS, listing him as "Owner." ABOU-RASS told agents that at no time was he the owner of IVPS and that he did not affix his signature to the Annual Report.

157)   On or about July 20, 2017, a Resignation of Resident Agent form was submitted to LARA, resigning ABOU-RASS as Resident Agent. The document bears a signature purporting to belong to ABOU-RASS. ABOU-RASS told agents that at no time was he the Resident Agent of IVPS and that he did not affix his signature to the Resignation.

158)   On or about August 30, 2017, a Certificate of Change of Resident Agent was submitted to LARA, listing MALAS as the registered agent.

159)   On or about April 16, 2020, MALAS signed Annual Statements for the 2017, 2018, 2019, and 2020 calendar years, listing himself as the Registered Agent, and listing MUNIER EL-BECK as the sole manager in the years 2017 and 2018. For the year 2019, MALAS listed himself as the sole manager.

### H. Phone Records

160)   Phone records obtained from Verizon Wireless show that the cell phone number (248) 854-5357 has been assigned to MALAS since at least June 2017, and is the number assigned to the Subject Telephone. The associated address is Subject Premises-1.

161)   The cell phone logs for the number (248) 854-5357 show the following contacts with other individuals involved in the scheme alleged:

- Diane KING: approximately 85 calls from August 2017 through September 2020;

- Teofil GHERASIM: approximately 498 calls from August 2017 through September 2020;

- Michael MOLLOY: approximately 140 calls from August 2017 through September 2020;

- Abbas GINAI: Approximately 369 calls from August 2017 through September 2020.

162)   The SMS data logs for the number (248) 854-5357 show the following contacts with other individuals involved in the scheme alleged:

- Teofil GHERASIM: approximately 193 text messages from July 2020 and July 2021;

- Michael MOLLOY: approximately 133 text messages from July 2020 and July 2021;

- Abbas GINAI: approximately 14 text messages from July 2020 and July 2021.

53

163)   In addition to SMS text messages, GHERASIM and ABOU-RASS told agents that MALAS communicated through a messaging application, WhatsApp, which stores data on cell phones.

164)   The device information obtained via subpoena from Verizon Wireless show that the Subject Telephone is assigned telephone number (248) 854-5357, and subscribed to by MALAS.

## LOCATIONS TO BE SEARCHED

### Subject Premises-1: Infinity Visiting Physicians Services, PLC
### 18000 West Nine Mile Rd, Suite 630, Southfield, Michigan

165)   This warrant applies to the premises located at 18000 West Nine Mile Rd, Suite 630, Southfield, Michigan. The premises is located on the sixth floor of Southfield center building. The building housing IVPS is a 15-story office building also housing multiple businesses. The building is gray in color with blue trimming on the corners of the northwest and the southeast of the building.

166)   GHERASIM told agents, after visiting Subject Premises-1 on November 19, 2021, that IVPS was on the sixth floor of the building located at 18000 West Nine Mile, Suite 630, Southfield, Michigan 48075. There is a hallway to the left of the elevators that led to MALAS's office which had a Ring doorbell camera. The office also had cubicles where GHERASIM saw paperwork, desktop computers, and laptops. GHERASIM saw MATAVERDE, WIDLANSKY, and other IVPS employees within Subject Premises-1.

54

167)   GHERASIM told agents that patient files are stored at Subject Premises-1, including files for patients of MATAVERDE, WIDLANSKY, OPRISIU, USHER, and ABOU-RASS.

168)   A video recording by GHERASIM of his visit to Subject Premises-1 on November 19, 2021, shows IVPS is located on the sixth floor with an entrance of a double glass door. There are signs indicating "INFINITY VISITING PHYSICIANS" on the right side of the entrance.  The main entrance opens to an open area with a sign on the wall with the writing: "INFINITY VISITING PHYSICIANS." The floor of the main entrance has a black mat with IVPS's logo and the writing "INFINITY VISITING PHYSICIANS."

169)   According to records obtained from the Southfield Fire Department, which conducted a site inspection of Subject Premises-1 on December 2, 2021, IVPS was located at 18000 West Nine Mile, Suite 630, Southfield, Michigan 48334. The inspections are normally conducted for office spaces or suites that have new occupants. The Southfield Fire Department provided your Affiant with the photograph below of the main entrance to IVPS:



**Subject Premises-2: Pinnacle Physician Management Services, LLC
18000 West Nine Mile Rd, Suite 620, Southfield, Michigan**

170)   This warrant applies to the premises located at 18000 West Nine Mile

Rd, Suite 620, Southfield, Michigan. The premises is located on the sixth floor of

Southfield center building. Like Subject Premises-1, the building housing PPMS is

a 15-story office building also housing multiple businesses. The building is gray in

color with blue trimming on the corners of the northwest and the southeast of the

building.

171)   GHERASIM told agents, after visiting Subject Premises-1 on

November 19, 2021, the first office after stepping out of the elevators of the sixth

floor slightly to the right side was ADRIANE SCHOENHERR's office. There was

56

a double glass door leading to IVPS' offices next to Subject Premises-2. Additionally, there was a room slightly protruding off the main wall that was designated to be the lab room for IVPS. SCHOENHERR, IVPS, and the lab all had entrances from the outside that led to the elevators. The lab and SCHOENHERR's office spaces could also be accessed from inside IVPS' office space.

172)   GHERASIM stated SCHOENHERR's office was on the right side after entering IVPS's main entrance and the office space designated for the lab was on the left side. IVPS was planning to build its own lab within that office space.

173)   GHERASIM told agents that PPMS provides billing services for IVPS and maintains records associated with IVPS billing to Medicare at Subject Premises-2.

174)   On October 5, 2021, investigators conducted a trash pull at Subject Premises-3. Inside the trash, investigators located LARA Certificate of Change of Registered Agent paperwork. The resident agent was listed as MALAS, identification number 802431893, address 6829 Queen Anne Court, West Bloomfield, Michigan 48322 (Subject Premises-3), and the corporation was PPMS. ADRIAN SCHOENHERR, address 1800 West 9 Mile, suite 620, Southfield, Michigan 48075, was also listed as the Resident Agent.

175)   Documents obtained from LARA demonstrated PPMS street address as 1800 West 9 Mile Road, Suite 620, Southfield Michigan 48075. The Agent

listed on the Certificate of Change of Registered Office and/ or Resident Agent as

ADRIAN SCHOENHERR.



176)   According to records obtained from the Southfield Fire Department

concerning a site inspection of Subject Premises-2 on August 13, 2021, the PPMS

suite had six workstations and an office labeled ADRIAN M SCHOENHERR,

MBA, HCM. A woman named SHARON (last name unknown-LNU) and two

other women were working inside the suite. The IVPS suite and PPMS suite have a

door connecting the two spaces, but it was locked. The Fire Marshal provided the

following photograph of PPMS:



**Subject Premises-3:**
**6829 Queen Anne Court, West Bloomfield, Michigan 48332**

177)   This warrant applies to the premises located at 6829 Queen Anne

Court, West Bloomfield, Michigan 48332. The premises is located on the edge of a

cul-de-sac. It is a multi-level, single family residence made of reddish-brown brick.

The garage of the premises faces east and is accessible from the cul-de-sac.

178)   Based on a review of corporate filings, the following businesses list

Subject Premises-3 as the registered address:

    a)  INFINITY VISITING PHYSICIAN SERVICES, PLC

    b)  PEGASUS MANAGEMENT ASSOCIATES, LLC;

c) GRANADA LLC;

d) INFINITY NEURO DIAGNOSTICS PLLC;

e) MARBELLA PROPERTIES LLC;

f) PINNACLE PHYSICIAN MANAGEMENT SERVICES;

g) PREMIER INTEGRATED HEALTHCARE GROUP PLLC; and

h) A1 QUALITY DME LLC.

179) Based on a review of bank account statements obtained via subpoena for each of the businesses described in the preceding paragraph, bank accounts for each of the following business, registered to Subject Premises-3, received funds traceable to the fraud scheme:

<u>Directly received Medicare funds</u>

| Financial Institution / Entity | Owner | Signature Card | Account # | Period Covered | | Amount |
|---|---|---|---|---|---|---|
| | | | | Start Date | End Date | Received |
| JPMorgan Chase | Infinity Visiting Physician Services, PLC | Radwan Malas, Nawaf Masri, Hassan Abou-Rass | 658130302 | 1/1/2020 | 4/30/2021 | $  6,427,568.00 |

<u>Received funds from IVPS traceable to the fraud scheme</u>

| Financial Institution / Entity | Owner | Signature Card | Account # | Amount Received |
|---|---|---|---|---|
| JPMorgan Chase | Infinity Neuro Diagnostics PLLC | Radwan Malas | 0525665177 | $            6,500.00 |

60

| JPMorgan Chase | Marbella Properties LLC | Radwan Malas | 525675168 | $ 200,000.00 |
| JPMorgan Chase | Pegasus Management Associates LLC | Rawan Malas | 0269760069 | $ 371,500.00 |
| JPMorgan Chase | Pinnacle Physician Management Services LLC | Radwan Malas | 610617703 | $ 9,500.00 |
| JPMorgan Chase | Premier Integrated Healthcare Group PLLC | Radwan Malas | 000000525667819 | $ 7,000.00 |

### Received funds from other business linked to MALAS traceable to the fraud scheme

| Financial Institution / Entity | Owner | Signature Card | Account # | Period Covered | | Amount |
| | | | | Start Date | End Date | Received |
| JPMorgan Chase | A1 Quality DME LLC | Radwan Malas | 0525663008 | 9/6/2019 | 4/30/2021 | $ 150.00 |
| Fifth Third Bank | Radwan Malas | Radwan Malas | 7973782217 | 8/20/2020 | 4/19/2021 | $ 1,000.00 |
| Fifth Third Bank | Radwan Malas | Radwan Malas | 9906482683 | 12/30/2014 | 9/28/2020 | $ 201,000.00 |

180)   On October 5, 2021, federal agents conducted a trash pull at Subject Premises-3. Inside the trash, investigators located IRS form 4506-T (request for transcript of tax returns) for PEGASUS, employer identification number 82-2577036, current address 6829 Queen Anne Court, West Bloomfield, Michigan 48322 (Subject Premises-3), the residence of MALAS.

181)   On October 5, 2021, federal agents conducted a trash pull at Subject Premises-3. Inside the trash, investigators located GM leasing receipt, in the name of IVPS, for a 2018 Chevrolet Equinox, account number XXXXXX0652, with a listed balance of $5,114 dollars.

61

182)   Additionally, the trash pull located a single authorization of an outgoing wire transfer form for $17,000 dollars to a J.P. Morgan Chase Bank account. The customer was IVPS and the beneficiary was listed as PEGASUS, account number 269760069, and swift code number 072000326.

183)   Investigators have observed vehicles registered to MALAS at Subject Premises-3 on multiple occasions.

184)   Documents obtained from LARA demonstrated the registered office mailing address for PPMS is 6829 Queen Ann Court, West Bloomfield, Michigan 8332 (Subject Premises-3), the residence of MALAS.



**Subject Telephone: SAMSUNG GALAXY NOTE20 Ultra 5G, IMEI: 352712280530902, and assigned phone number (248) 854-5357**

185)   Phone records obtained via subpoena from Verizon showed that telephone account (248) 854-5357 is an active account subscribed to by MALAS. The account has been active since at least June 22, 2017. As of August 10, 2021, the phone is described as a SAMSUNG GALAXY NOTE20 Ultra 5G, International Mobile Equipment Identity ("IMEI") number of 352712280530902, and assigned call number (248) 854-5357, serviced by Verizon.

## REQUEST TO SEIZE COMPUTERS, ELECTRONIC DEVICES, AND ELECTRONIC RECORDS

186)   Based on my training and experience, business offices rely upon computers or other electronic devices to create and store data, including billing data.  It is likely that the provider's insurance billing and patient records, documents, and materials will be found stored on computers within the Subject Premises.

187)   For the reasons stated above, including that computers were seen in operation at the Subject Premises-1 and Subject Premises-2 as recently as December 2, 2021, and that MALAS was known to work with his laptop at Subject Premises-3, there is probable cause to believe that one or more computers in the Subject Premises were used to generate false billings and contain information including records, documents, and materials relating to the Subject Offenses.

63

188)   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data ("Computer Personnel") will access any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data.

189)   If the Computer Personnel determine that the data reviewed does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time from the date of seizure unless further authorization is obtained from the court.

190)   Authority is sought to search any computer hardware or computer related equipment capable of creating and/or storing information in electronic or magnetic form.  Computer related equipment includes, but is not limited to, central processing unit(s), and/or peripheral equipment used to facilitate the creation, transmission, encoding or storage of information. Agents seek the authority to search for any or all information and/or data stored in the form of magnetic or electronic encoding on computer media, or on media capable of being read by a computer, or with the aid of computer related equipment.  This media includes, but is not limited to, floppy disk(s), fixed hard disk(s), removable hard disk cartridge(s), tape(s), laser disk(s), videocassette(s), CD-ROM(s), zip disk(s), smart

64

card(s), memory stick(s), memory calculator(s), PDA(s), and/or other media that is capable of storing magnetic coding.

191)   If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.  If the agent determines the material found on the premises is too voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.  Authority is sought to seize software, documentation and instruction manuals, operating logs and manuals, utility programs, compilers, interpreters, cabling and connectors, or any other equipment, programs, or software used to facilitate direct or indirect communication with the computer hardware and/or software.

192)   In most cases, a thorough search of the premises for information that might be stored on storage media often requires the seizure of the physical storage media and later offsite review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or

65

imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

193)   Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media onsite, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## REQUEST TO SEIZE CELLULAR TELEPHONES

194)   Based on my training and experience, owners and operators of medical and home health care offices, as well as conspirators in an illegal scheme, rely upon cellular or mobile telephones in order to communicate via telephone, text messaging, and email. This data is often crucial in identifying other co-conspirators and the details of criminal activity.

195)   Based on my training and experience, I know that electronic devices, such a "smart" cellular telephones, can store information for long periods of time. I know that electronic data, including archived communications and other records,

can be transferred to a cellular telephone from other devices, including another

cellular telephone.  I know that even when files have been deleted, they can be

recovered months or years later using forensic tools.

196)   As previously articulated, Subject Telephone is a SAMSUNG

GALAXY NOTE20 Ultra 5G, IMEI: 352712280530902 and assigned phone

number (248) 854-5357, currently serviced by Verizon, and assigned to MALAS.

Paragraphs 160-164 establish probable cause that the Subject Telephone contains

evidence of the Subject Offenses described herein.

197)   The warrant I am applying for would permit law enforcement to

obtain from certain individuals the display of physical biometric characteristics

(such as fingerprint, thumbprint, or facial characteristics) in order to unlock

Subject Telephone pursuant to this warrant.  I seek this authority based on the

following:

a) I know from my training and experience, as well as from information found

in publicly available materials published by device manufacturers, that many

electronic devices, particularly newer mobile devices and laptops, such as

Subject Telephone, offer their users the ability to unlock the device through

biometric features in lieu of a numeric or alphanumeric passcode or

password. These biometric features include fingerprint scanners and facial

recognition features. Some devices offer a combination of these biometric

features, and the user of such devices can select which features they would like to utilize.

b)  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c)  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

68

d) In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e) The passcode or password that would unlock the Subject Telephone is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f) I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last

69

unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g) In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the

70

device, to unlock the device using biometric features in the same manner as discussed above.

h) Due to the foregoing, if law enforcement personnel encounter Subject Telephone, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **CONCLUSION**

198)   Based on the foregoing, there is probable cause to believe, and I do believe, that the Subject Premises-1, Subject Premises-2, Subject Premises-3, and Subject Telephone, further described in Attachments A-1 through A-4, contain evidence, fruits, and/or instrumentalities of crime, further described in Attachments B1 through B-4, namely violations of the Subject Offenses.

## REQUEST FOR SEALING

199)   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organization as not all of the targets of this investigation will be searched at this time. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Arnold K. Kusero
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my

Presence and/or by reliable electronic means,

Honorable Anthony P. Patti     February 19, 2022
UNITED STATES MAGISTRATE JUDGE

72

## <u>ATTACHMENT A-4 – Property to Be Searched</u>

The property to be searched is:

      1.     A SAMSUNG GALAXY NOTE20 Ultra 5G cellular telephone, bearing IMEI: 352712280530902, and assigned phone number (248) 854-5357 ("Subject Telephone").

<u>**ATTACHMENT B-4**</u>

I.   <u>**ITEMS TO BE SEIZED FROM THE SUBJECT PHONE FURTHER**</u>

    <u>**DESCRIBED IN ATTACHMENT A-4**</u>

All records and information on Subject Telephone, from March 2015 to present, further described in Attachment A-4, including evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), 18 U.S.C. § 371 (Conspiracy to Defraud the United States and Pay and Receive Illegal Remunerations), 42 U.S.C. § 1320a-7b(b) (Paying and Receiving Remunerations), 21 U.S.C. § 841(a) (Unlawful Distribution of Controlled Substances), 21 U.S.C. § 846 (Conspiracy to Unlawfully Distribute Controlled Substances), and 18 U.S.C. §§ 1956 and 1957 (Money Laundering) (the "Subject Offense/s"), namely:

1.    Content of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, social media account activity (including browser history, web page logs, and search terms entered by the user), WhatsApp content and other electronic media constituting evidence or instrumentalities of the violations described above;

1

2.      Lists of employees, recruiters, beneficiaries, marketers, and related identifying and contact information (including names, addresses, phone numbers, or any other identifying information);

3.      Any information related to paying physicians, physicians practices, recruiters, marketers, and/or beneficiaries, durable medical equipment ordered, durable medical equipment dispensed, durable medical equipment billed as well as dates and amounts of specified transactions.

4.      All bank records, checks, credit card bills, account information, and other financial records.

5.      Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

6.      Evidence of the times the device were used;

7.      Passwords, encryption keys, and other access device that may be necessary to access the devices;

8.      Contextual information necessary to understand the evidence described in this attachment, all of which constitute evidence and instrumentalities of the violations described above.

9.      Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

10.     Records of or information about Internet Protocol addresses used by the device;

11.     Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12.     As used herein, the terms "records," "documents," "programs," "applications," and "materials" include any writing, records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof (collectively referred to herein as "documents").

13.     As used herein, the term "digital device" refers to Subject Telephone.

14.     During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device

3

found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## II.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

1.     The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of privileged information.

2.     These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in the investigation (the "Search Team") (b) individual(s) not participating in the investigation of the matter, who will be available to assist in the event that a procedure involving potentially privileged information is required (the "Privilege Review Team"); and (c) the Special Matters Unit ("SMU") of the Criminal Division, Fraud Section.  SMU attorneys and support staff are not and will not become part of the prosecution team, and have a separate reporting chain from the prosecution team.

3.     In consultation with the SMU, if appropriate, the Search Team will search for the digital device. If the digital device is reasonably considered to contain potentially privileged information will be transferred to the SMU.  Upon receipt of electronic data such as an email account for a filter review, the SMU will

4

review the identified digital device as set forth herein for potentially privileged information.

4.     The Search Team will, in their discretion, either copy the digital device(s) on-site or seize and copy such device(s), and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be copied at that location, or provide the material directly to the SMU.

5.     The SMU, in consultation with the Search Team, will compile a list of "privilege search terms" to be used to electronically search the digital devices, including specific names and generic words intended to identify potentially privileged information.  The SMU will conduct an electronic review of the data on the digital devices using the privilege search terms, and by using search protocols specifically chosen to identify and segregate documents or data containing potentially privileged information.  All of the data contained in each digital device capable of containing any of the items to be seized may be reviewed using this procedure.  Documents or data that are identified by this review as not potentially privileged, including documents that do not contain the privilege search terms, may be released to the Search Team without court intervention.  Notwithstanding the procedures set forth in this paragraph, where a Search Team member otherwise reviews documents not previously determined to contain potentially privileged information, and later determines that such documents may be potentially

privileged, the documents will then be provided to a Privilege Review Team

member and handled in accordance with the procedures described in this

paragraph.

6.      Documents or data identified during the initial privilege search terms

review to be potentially privileged will be segregated.  An SMU attorney may

thereafter review the segregated documents to confirm whether or not they contain

potentially privileged information.  If the SMU attorney determines the documents

or data are not potentially privileged, they may be given to the Search Team.  If at

any point the Search Team identified any data or documents that they believe to be

potentially privileged, they will cease the review and refer the materials to the

SMU for further review by the SMU.  If the SMU attorney determines that

documents are potentially privileged, the SMU attorney may do any of the

following: (a) apply ex parte to the court for a determination whether or not the

documents contain privileged information; (b) defer seeking court intervention and

instead segregate the documents in a manner that makes them inaccessible to the

search team; or (c) disclose the documents to the potential privilege holder, request

a privilege log if the potential privilege holder asserts privilege, and seek a ruling

from the court regarding the documents if the parties cannot reach agreement.

7.      In performing the reviews, both the SMU and the Search Team may

search for and attempt to recover:

6

a. deleted, "hidden," or encrypted data;

b. Records and information indicating the identity and location (both past and present) of the person(s) who use or access the Subject Accounts or who exercise in any way any dominion or control over the accounts, including but not limited to associated email accounts and other internet-based accounts, login Internet Protocol ("IP") addresses, and session times and durations

c. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

d. use forensic examination and searching tools, such as Relativity, Cellebrite, EnCase and FTK (Forensic Tool Kit).

8. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and/or delete or destroy all forensic copies thereof. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

9. If the search determines that a digital device is (a) itself an item to be seized and/or (b) contains data falling within the list of other items to be seized, the government may retain forensic copies of the digital device but may not access

7

data falling outside the scope of the other items to be seized absent further court order or written consent of the property owner.

10.     In order to search for data capable of being read or interpreted by a digital device, and obtain all information authorized to be seized in Paragraph 1 above, the Search Team is authorized to seize the following items:

a.     Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.     Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.     Any magnetic, electronic, or optical storage device capable of storing digital data;

d.     Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.     Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.     Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

8

g.      Any passwords, password files, biometric keys, test keys, encryption

codes, or other information necessary to access the digital device or data

stored on the digital device.

AUSA:    Shankar Ramamurthy         Telephone:  (202) 924-5368

AO 93  (Rev. 11/13) Search and Seizure Warrant      Special Agent:    Arnold Kusero         Telephone:  (313) 919-1615

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of | ) | Case: 2:22-mc-50219 -4 |
| *(Briefly describe the property to be searched* | ) | Judge: Drain, Gershwin A. |
| *or identify the person by name and address)* | )  Case No. | Filed: 02-19-2022 At 05:03 PM |
| SAMSUNG GALAXY NOTE20 Ultra 5G, IMEI: | ) | IN RE: SEALED MATTER(SW)(MLW) |
| 352712280530902 | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-4.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B-4, violations of:
18 U.S.C. § 1343, 18 U.S.C. § 1347 (Health Care Fraud)
18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud)

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 5, 2022 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    February 19, 2022    4:51 pm _____

_____
*Judge's signature*

City and state:    Detroit, MI _____      Hon. Anthony P. Patti     U. S. Magistrate Judge
_____
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*